**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **FLEUR S. BRESLER,** *as Co-Personal* | * | |
| *Representative of the Estate of Charles* | * | |
| *S. Bresler,* **and SIDNEY BRESLER,** | * | |
| *Individually and as Co-Personal* | * | |
| *Representative of the Estate of* | * | |
| *Charles S. Bresler* | * | |
| | * | |
| | * | Civil No.   **PJM 09-2957** |
| Plaintiffs | * | |
| | * | |
| v. | * | |
| | * | |
| **WILMINGTON TRUST COMPANY, et al.** | * | |
| | * | |
| | * | |
| Defendants | * | |

_____

| | | |
|---|---|---|
| **FLEUR S. BRESLER,** *as Co-Personal* | * | |
| *Representative of the Estate of Charles* | * | |
| *S. Bresler,* **and SIDNEY BRESLER,** | * | |
| *as Co-Personal Representative of the Estate* | * | |
| *of Charles S. Bresler* | * | |
| | * | |
| Plaintiffs | * | Civil No.   **PJM 12-3295** |
| | * | |
| v. | * | |
| | * | |
| **WILMINGTON TRUST COMPANY** | * | |
| | * | |
| | * | |
| Defendant | * | |

## OPINION

In Civil No. PJM 09-2957, Fleur Bresler and Sidney Bresler, as Co-Personal

Representatives of the Estate of Charles ("Charlie") Bresler, sued Wilmington Trust Company

and its subsidiary Wilmington Brokerage Services Company (collectively, "WTC") for alleged

breaches by WTC of certain agreements designed to provide life insurance for Charlie Bresler.[1] In Civil No. PJM 12-3295, Fleur (Charlie's wife) and Sidney (his son),[2] as Co-Personal Representatives of Charlie's Estate, brought a second suit against WTC, claiming that it breached a related agreement—specifically, an Investment Management Agreement—by refusing to return certain collateral to Charlie's estate that it allegedly promised to return upon his death.[3]

Following a four-week trial, a jury concluded that WTC had breached its agreements with Charlie and awarded the Breslers in excess of $23 million in damages. The equitable relief sought by the Breslers in PJM 12-3295 was left for the Court to decide following the jury verdict. This Opinion addresses the merits-related post-trial motions filed by the parties. Other pending, largely procedural motions will be addressed in a separate Opinion. For the reasons that follow, WTC's Motion for Judgment as a Matter of Law or Alternatively to Amend the Verdict, Set a New Trial and/or Require Remittitur will be **DENIED**, WTC's Motion for Other Relief will be **DENIED**, and the Breslers' request for specific performance will be **GRANTED**. First, some factual background.

---

[1] In this docket, Sidney Bresler also filed suit in his individual capacity. In addition to WTC, the Breslers sued Highland Capital Brokerage, Inc., Edmond Ianni, Richard Biborosch, Ralph Wileczek, and Matthew Waschull, WTC operatives all, in several counts related to the purported breaches by WTC. Highland Capital, Biborosch, and Ianni were previously dismissed as Defendants.

[2] For the sake of clarity, and without intending any disrespect, the Breslers will be referred to in this and any accompanying opinion as either "the Breslers," or, where appropriate, by their first names.

[3] Because of the overlap of certain counts in PJM 09-2957 and PJM 12-3295, the Court consolidated the cases. *See* Paper No. 481. At the same time, claims within the two cases were bifurcated to address the breach of contract claims in both cases prior to addressing the non-contract claims against Co-Defendants Wileczek and Waschull individually, as well as counterclaims by Wilmington Brokerage Services Company and Waschull against the Breslers.

# I.
## A.

By 2003, Charlie Bresler, then in his late seventies, was capping a successful career as a businessman, during which he had accumulated an estate worth several million dollars.[4] Accordingly, he began to consider how, after his death, he might provide for the future of his wife Fleur, his five children, and nine grandchildren, looking for a way to transfer his sizable estate to them with minimum trouble and expense.  Eventually, Charlie's concerns came to the attention of WTC, which had previously done business with Charlie in connection with some of his corporate interests.  WTC was eager to expand its wealth management relationship with Charlie, employing what it styled a "tax-saving wealth creation and preservation strategy."  As a result, WTC, through certain of its operatives, Edmond Ianni and Ralph Wileczek, introduced Charlie to a life insurance plan known as "premium financing."  Under the premium financing concept, WTC, either as lender or through another lender, would make loans to Charlie for the purchase of insurance policies on his life that would be held by a tax-sheltered Irrevocable Life Insurance Trust ("ILIT"), also created by WTC, which, as structured by WTC, would be administered by WTC as Trustee.

Unlike typical life insurance policies, which only provide fixed death benefits, the ILIT policies consisted of two components: (1) a death benefit and (2) an investment account which would increase in value each year according to an interest rate known as the "crediting rate," which in turn would increase the amount of the death benefit.  Since the crediting rate that the insurance companies would be paying on the policies was projected to be higher than the borrowing rate WTC proposed to charge for the loans it would make, the ILIT could profit

---

[4] Charlie Bresler died on October 26, 2010, approximately one year after PJM 09-2957 began.  Prior to his death, he gave an extensive deposition detailing his negotiations and his understanding of his agreement with WTC.  The deposition was videotaped, and extensive portions were played for the jury at trial.

simply by borrowing money from WTC at the lower interest rate while earning higher interest at the crediting rate. Additionally, because the money would be earned within an ILIT, the increases would enjoy certain tax benefits. To take full advantage of the insurance policies' investment accounts, WTC proposed not only to make loans to cover the annual minimum premium payments on the policies; it would also "overfund" the policies to increase the size of the investment account, occasioning in turn the payment of a higher crediting rate as well as an increase in the amount of the death benefit. All parties stood to benefit under the plan. At Charlie's death, an enhanced death benefit would be available to repay WTC its loans with interest in full, while an enhanced death benefit (the "Net-in-Trust") would pour into the ILIT and pass to Charlie's heirs tax free.

In the Spring of 2003, Ianni and Wiliczek, at the time vice-presidents at WTC, explained the premium financing concept to Charlie and his attorney, Larry Shaiman. On May 19, 2003, they sent Charlie a letter captioned "Tax-Saving Wealth Creation and Preservation Strategy." Plaintiffs' Trial Exhibit ("PTX") 2C. In it they proposed that WTC would lend a Bresler ILIT the annual premiums on the policies plus the maximum in allowable overfunding—at the time $4,592,552 in aggregate[5]—for the purchase and maintenance of a $40 million increasing death benefit permanent joint survivorship life insurance policy or policies.[6] The letter included a spreadsheet showing how WTC's "Premium Outlay" of $4,592,552 each year would increase the value of the policies over more than twenty years.

---

[5] The amount of allowable overfunding would be controlled by what is known as a Modified Endowment Contract ("MEC"). Because this kind of life insurance policy provides various tax advantages, the MEC is defined by an IRS regulation that essentially caps the amount that may be put into the policies without incurring substantial taxes. The MEC is generated by a formula and the number can change. In the Breslers' case, the MEC ceiling eventually rose to $5.5 million per year and the increasing death benefit to $50 million.

[6] Given Charlie's age and the difficulty of obtaining insurance on his life alone, the policies were proposed to be joint survivorship policies in the names of both Charlie and Fleur, payable upon the death of the second of them.

4

Negotiations regarding the premium financing plan, primarily involving Ianni and Attorney Shaiman, continued well into 2003.  On September 3, 2003, Ianni sent Charlie a letter indicating that WTC had committed to make loans to a Bresler ILIT for the purpose of acquiring and maintaining the insurance policies of his and Fleur's lives.  PTX 5.  At the time, the MEC ceiling allowed WTC to provide up to $4.9 million per year.  Accordingly, Ianni's letter included a chart that calculated what the value of the policies would be if WTC overfunded the policies at $4.9 million per year over a period of twenty-five years, as well what would remain as the Net-in-Trust for the Bresler beneficiaries after WTC's loans and interest were repaid.  The letter made no mention of whether Charlie would be required to post collateral in exchange for the loans, stating only that he would be required to make an initial $500,000 gift to the ILIT, as well as annual gifts to the trust of $44,000, the latter being the maximum amount contributable in any given year that would avoid gift tax liability.[7]   According to Charlie and the Breslers, these limited payments were particularly important because Charlie wanted a plan that would not create continuing financial obligations for his family—especially Fleur—after his death.

On that same day, however, September 3, 2003, WTC officers—including Ianni—but not Charlie or Attorney Shaiman—held internal discussions at which they decided that Charlie, in exchange for WTC's annual loans to fund and overfund the insurance policies, would be required to post collateral, which they estimated to be in the total amount of some $31.5 million over the next ten years. PTX 33; Trial Transcript ("Tr."), Jan. 9, 2014, at 99:20–101:01. At the time, no one from WTC shared that number—nor indeed any specific number—with Charlie or

---

[7] The $44,000 reflected the annual amount exempt from gift tax, and is associated with what is known as a *Crummey* gift to a *Crummey* trust.  *See Crummey v. Commissioner of Internal Revenue*, 397 F.2d 82 (9th Cir. 1968).

Attorney Shaiman, nor indeed did anyone from WTC suggest to either of them that a continuing substantial collateral obligation on Charlie's part would be required at all.

On the contrary, to the day of his death, Charlie insisted that Ianni continuously represented to him and his family—both orally and in writing—that any collateral requirement would be minimal, since the death benefits payable under the insurance policies, by themselves, would be more than adequate to cover his loan obligations to WTC.  In that regard, Charlie testified that he relied not only on Ianni's letter to him on September 3, 2003, but also on a September 4, 2003 call involving him, Shaiman, and Ianni, in which they discussed only the $500,000 initial gift and $44,000 per year contribution to the ILIT, and in which collateral was not mentioned at all.  Correspondingly, Ianni's handwritten notes of that call, introduced at trial, were silent as to any discussion of collateral obligation.  PTX 34.  On September 12, 2003, Ianni sent an email to Shaiman and Charlie, including an updated spreadsheet projection that showed the increasing value of the life policies on the assumption that Wilmington Trust would lend $5.5 million annually into the policies.  Still, Ianni made no mention of any collateral obligation on Charlie's part.  PTX 6.

At some point over the next two months, however, Charlie, to his dismay, learned from Ianni that WTC was in fact demanding that he post collateral in exchange for its loans.  Charlie, through Attorney Shaiman, bristled at the demand.  On November 7, 2003, Shaiman sent Ianni an email expressing Charlie's unhappiness at this development, in which he suggested that perhaps all the negotiations between WTC and Charlie had been a waste of time.  PTX 10. On November 10, 2003, Ianni replied, contending that he and Wileczek had in fact previously discussed the notion of collateral, at least with Shaiman, as part of the overall structure of the

transaction, but stressed that it "is simply a pledge—no personal guarantee is required."  Ianni

went on:

> Because the economics of [Charlie's] contemplated insurance policies are so
> strong, the amount of collateral that we recently discussed for [Charlie] is
> minimal, as the value of the contemplated trust's respective main asset (namely,
> the significant, growing cash value of the policy, as well as the increasing death
> benefit) is substantial; that, as you know, will serve as the significant source for
> satisfaction of the trust's outstanding loan to [WTC].

*Id.*  Ianni's notes from a November 17, 2003 discussion with Shaiman, *i.e.*, one week later,

indicate that Shaiman told Ianni that, so long as there would be no collateral requirement, Charlie

would take the deal.  PTX 46.

Four days later, on November 21, 2003, Ianni, on behalf of WTC, sent Charlie another

letter outlining the terms of the premium financing plan. Defendant's Trial Exhibit ("DTX") 4.

The letter said that "Wilmington Trust would loan to the trust the annual premium plus allowable

overfunding ($5.5 million) to acquire and maintain" $50 million of permanent increasing death

benefit joint survivorship life insurance.  The letter stated further that WTC had calculated what

the required posting of collateral for the first year would be, and offered three options: (1) $2.9

million if in the form of CDs; (2) $3.7 million if in the form of bonds; or (3) $4.2 million if in the

form of equity securities.  As to the possibility of any future collateral, the letter stated:

> The amount of the needed collateral going forward obviously will depend in part
> on the aggregate cash surrender value of the trust's assets (namely, of the
> insurance) and will be reviewed periodically.  No personal guarantee from you or
> Fleur (other than what may be required for the pledged collateral; i.e., no recourse
> beyond the specified collateral), however, would be required.

The letter then reminded Charlie of the choices he faced.  He could do nothing, *i.e.*

purchase no life insurance, and his estate would end up paying more than $50 million in estate

taxes upon his death.  Alternatively, he and Fleur could purchase fixed life insurance on their

own.  As explained by Ianni, that choice would require that Charlie and Fleur pay $1,637,078 in

annual premiums in return for a fixed death benefit of $50 million, so that if either of them lived

for ten years, the net insurance benefit would be the difference between the fixed $50 million

face amount of the policies minus the cost to maintain the policies, approximately $16 million, a

net to Charlie's beneficiaries of some $34 million.  Or, finally, Charlie could adopt WTC's

premium financing plan, again as explained by Ianni:

> You and Fleur can choose to have Wilmington Trust use its capital (not yours), by
> lending to your new Delaware trust, to secure your desired insurance with better
> terms and on a tax-advantaged basis.  The insurance in that case would not be
> fixed at $50 million, but would provide an increasing death benefit, starting at $50
> million and increasing from there.  In that case, too, you would not have to pay
> $1.6 million annually out of your own pocket (e.g., over $16 million in ten years,
> as noted in the above example), but simply would be using an aggregate gift tax
> exclusion of $44,000 (as Larry directed) and pledging the required collateral.

The letter estimated that the death benefit would range from $50 million to more than $190

million over the next twenty years, with potential tax savings of anywhere from $24.5 million to

over $115 million. The range of the Net-in-Trust flowing into the ILIT under WTC's plan was

estimated to be "$40 million to over $45.5 million."

In his deposition played at trial, Charlie testified that, when he saw the November 21,

2003 letter, "I probably hit the ceiling."  He went on to say that, given the collateral demand, he

was inclined to forego the plan altogether.  But Charlie also testified that Ianni assured him that,

after posting the initial $3.7 million in bonds, which were ultimately placed into an account that

was held as collateral, the money would come back to him as soon as the value of the insurance

policies increased to a sufficient amount.  In any event, the IMA stated that WTC "shall deliver

to [the Breslers] . . . all of the property held by it" in the collateral account upon termination of

the IMA, which would occur upon written notice of Charlie's death. IMA § V.

Based on Ianni's assurances, Charlie acceded to WTC's premium financing plan.  In the first part of 2004, he entered into three written agreements with WTC, styled respectively as: the Charles S. Bresler Irrevocable Life Insurance Trust Agreement (the "Trust Agreement" or ILIT); the Investment Management Account (the "IMA"); and the Collateral Pledge Agreement (the "Pledge Agreement," the three of which are collectively referred to as the "Agreements"). PTX 12, 15, 16.  Notably, while each agreement was a component part of the premium financing plan, none set forth the precise terms of any future loans WTC was to make, none indicated that Charlie had a definite obligation to post collateral on a continuing basis, and none contained an integration clause.  The Trust Agreement created the Charles S. Bresler Irrevocable Life Insurance Trust (the "Bresler Trust"), naming WTC as Trustee and Charlie's son, Sidney, as Trust Adviser.  It listed Charlie's children as beneficiaries, and granted WTC the authority to borrow on behalf of the Trust.  The Pledge Agreement governed Charlie's posting of $3.7 million in bonds as collateral, while the IMA granted WTC the authority to manage that collateral on Charlie's behalf.

The Pledge Agreement provided that Charlie would "pledge and identify the following specific property [*i.e.*, the property in Account Number 64920-0, which held the $3.7 million in bonds] as subject to a security interest granted to Wilmington Trust company."  PTX 15 ¶ 1. This security interest was provided as "consideration of a certain extension of credit to the Charles S. Bresler Irrevocable Insurance Trust ("Borrower") evidenced by a Promissory Note dated January 15, 2004 (the "Note") and for other good and valuable consideration."  *Id.*  Again, the Pledge Agreement made no mention of any future obligation to post collateral, stating only that "[t]he above property, together with all additions thereto and substitutions therefor, now or hereafter pledged to [WTC], is hereinafter referred to as 'Collateral.'"  *Id.*

In fact, the evidence at trial strongly suggested that the issue of future collateral obligations had been discussed by the parties and had been intentionally excluded from the final Pledge Agreement.  Specifically, the Pledge Agreement Charlie signed indicated that Paragraphs Two and Four had been "Intentionally Omitted."  *Id.* ¶¶ 2, 4.  In marked contrast, the Breslers introduced a template "Collateral Security Agreement" used by WTC that essentially tracked all other provisions of the Pledge Agreement Charlie signed, but which included Paragraphs Two and Four, which were marked "Intentionally Omitted" from Charlie's agreement.  These two omitted paragraphs were entitled "Additional Encumbrances" and "Additional Security Interest," respectively. PTX 51 ¶¶ 2, 4.

Paragraph Two of the template, "Intentionally Omitted" from Charlie's Agreement, provided:

> If the Collateral shall at any time become unsatisfactory to Bank, then the Securities Intermediary or the undersigned, upon demand, shall encumber for Bank, as part of the Collateral, additional property which is satisfactory to Bank, to be held by the Securities Intermediary.  Any demands for further security made upon the undersigned, or any notices given to the undersigned by Bank, shall be sufficient if given orally to the undersigned, or by writing mailed or left at the last known address or addresses of the undersigned according to the Bank's records.

*Id.* ¶ 2.  Paragraph Four of the Template, "Intentionally Omitted" from Charlie's Agreement, provided:

> The undersigned hereby grant [sic] to Bank a lien upon and a security interest in all property of the undersigned now or at any time hereafter in possession of the undersigned or the Securities Intermediary, in any capacity whatsoever, including but not limited to, any balance or share of any deposit, trust account, investment agency account or custodian account, as security for the enforcement of the undersigned's obligation and all other liabilities of the undersigned, and the Bank shall have the same rights as to such property as it has with respect to the Collateral.

*Id.* ¶ 4.   Not only had these Paragraphs been marked "Intentionally Omitted" from Charlie's Pledge Agreement.   When asked why Paragraphs Two and Four of the template agreement were marked "Intentionally Omitted" from the Pledge Agreement, former WTC employee Glenn Best testified: "I'm assuming they were negotiated out."   Tr., Jan. 9, 2014, at 163:10–22.   Best also testified that nothing would have been deleted from the WTC template without approval of WTC's legal department.   *Id.* at 163:25–164:2.

At the same time, the IMA provided that it terminated upon WTC's receiving written notice of Charlie's death.   PTX 16 § V.d.   The IMA provided further: "Upon termination, [WTC] shall deliver to [Charlie], or to the executor or administrator of [Charlie's] estate . . . all of the property held by it hereunder."   *Id.*

The parties then embarked on their overall agreement, such as it was.   In the first full year, 2004, the premium financing plan went forward relatively smoothly.   WTC loaned $6 million to the Bresler Trust, $5.5 million of which was used to purchase and overfund $50 million in increasing death benefits under three joint survivorship universal life policies on the lives of Charlie and Fleur: (1) one from Midland National Life Insurance carrying a death benefit of $7,000,000; (2) a second from Sun Life Assurance Company of Canada carrying a death benefit of $18,000,000; and (3) a third from Travelers Life and Annuity Company carrying a death benefit of $25,000,000 (collectively, the "Bresler Trust Policies").   Charlie, for his part, reluctantly transferred $3.7 million in bonds to Wilmington Trust as collateral for the first-year loan.

The dispute giving rise to the present litigation arose in 2005, the second year of the plan. It was then that WTC demanded that Charlie post further collateral in the amount of $2,157,888 before it would provide another $5.5 million in loans to fund the Bresler Trust Policies.   Again,

Charlie took strong issue ("hit the ceiling," in his words), insisting that the plan required only that he post the initial $3.7 million in collateral (returnable to his estate after his death), after which any security would be provided by the accumulated death benefits of the insurance policies.  On March 18, 2005, Glenn Best of WTC sent an email to Matthew Waschull of WTC reporting Attorney Shaiman's dismay at WTC's request for additional collateral and implying that Shaiman had threatened legal action if WTC did not back down.  *See* PTX 78.  But WTC did not back down and the parties promptly found themselves at a stand-off.  WTC demanded further collateral and Charlie adamantly refused to provide it.  Fearing, however, that WTC might refuse to make even the minimum annual premium payments on the policies and that the policies would consequently lapse, on March 21, 2005, Charlie agreed, but only (in Sidney's words) as a "patch," to post an additional $1.3 million in collateral, in exchange for which WTC would lend $800,000 to cover the minimum premium payments on the policies plus interest on its outstanding loan for the second year.  The issue of collateral, however, remained unresolved.

From March 2005 on, the parties tried unsuccessfully to resolve their differences.  On November 16, 2005, Charlie, Sidney, and Shaiman had a meeting with WTC representatives Waschull, Wileczek, and Carl Hostetter "to address the source of the tension- the need for more collateral in the future."  PTX 85.  Sidney testified at trial that at that meeting they discussed alternative proposals, but that none came to fruition because they all suffered from the same flaw: WTC refused to give assurances that there would be no future collateral obligations, while the Breslers insisted that having no collateral obligation was a key feature of the original deal. Tr., Jan. 17, 2014, 203–04.

WTC continued to make various offers of alternative workouts, but the Breslers were amenable to none.  *See, e.g.*, PTX 94, 102, 105; DTX 25–27.  Most of these offers involved

selling one of the plan policies on the life settlement market and using the proceeds of such a sale to purchase different policies and reduce the need for collateral.  PTX 113.  Wileczek testified that policies sold on the life settlement market at that time would sell for approximately 22 percent of the face value of the policies.  Tr. Jan. 15, 2014, 120:18–121:4.  Sidney testified that, throughout, Charlie refused to budge; he insisted he had never agreed to a transaction involving future collateral commitments and simply would not do so under a revised agreement.  Tr., Jan. 17, 2014, 206:7–11.

Given their inability to reach a resolution, on October 4, 2007, the parties entered into a tolling agreement, acknowledging that "a dispute has arisen between [Charlie] and WTC regarding the process by which the structure and proposal of the insurance program was portrayed by agents of WTC."  PTX 125A–C.  As such, the parties agreed to maintain their rights to file future claims should negotiations fail.

During this time, Charlie (and eventually his survivors) posted no further collateral. (In fact, his survivors, pursuant to the IMA, sought and in the current litigation still seek, the immediate return of the $3.7 + $1.3, or $5 million in collateral to Charlie's estate).  WTC, for its part, provided no overfunding, but, beginning in 2005 undertook to pay and has continued to pay—under protest—the minimum annual premiums to keep the policies in effect, either by drawing down money it already paid in overfunding (from 2007 to 2009) or by annually lending to the ILIT amounts to cover the minimum premiums (which WTC has assured the Court it will continue to do—at least for the duration of this litigation).[8]

---

[8] WTC argues that, apart whatever its original agreement with Charlie might have been with respect to the requirement of Charlie posting collateral, Charlie waived any right to dispute his obligation to post future collateral when he agreed to post the $1.3 million in 2005.  WTC's argument is surprising but easily dispatched.  At all times it has been indisputably clear that, after the initial $3.7 million pledge, the issue of any future collateral obligation was hotly disputed and would remain so unless and until resolved either by the parties or at trial.  The October 2007

The dispute was not without other consequences.

In 2009, because WTC was threatening to not put any more money into the policies, Fleur went into the market and obtained "replacement" term insurance on her own life, which carried a fixed death benefit of $17.5 million. Those four policies required an annual premium payment of between $1.4 and $1.5 million. Sidney testified at trial that the policies had no cash surrender value; that, as of the time of trial, had cost $6.25 million to maintain; and that through 2014 would cost $7.75 million (*i.e.*, $6.25 million by the time of trial and another $1.5 million to the end of 2014). Tr., Jan. 22, 2014, 11:17–22; 20:20.

Other facts of note are these: WTC fired Ianni in 2005, and, sometime later, abandoned offering premium financing plans altogether. In 2007, Ianni filed suit against WTC in Delaware, seeking commissions he claimed were owed to him. WTC counterclaimed, alleging that Ianni had in fact been improperly misrepresenting the terms of premium financing policies to customers—including Charlie by name—telling them that they would not need to post additional collateral. That case resulted in a confidential settlement.[9] On October 26, 2010, Charlie Bresler passed away, but his family pressed on with the litigation.

## B.

Trial lasted for most of January 2014. At trial, the Breslers argued that the premium financing plan did not require Charlie to post collateral beyond the initial $3.7 million in bonds and then only until Charlie's death. Instead, they contended, WTC committed to lending $5.5 million each year for the purpose of paying the premiums and overfunding the Trust Policies in

---

tolling agreement, which acknowledged an ongoing dispute with respect to collateral and which reserved the parties' rights to bring claims related to the dispute, makes this crystal clear. No waiver of rights by Charlie can fairly be read into this.

[9] WTC objected to any reference by the Breslers to the Ianni litigation in the present case. The Court, however, permitted the Breslers to introduce the substance of the counterclaim as a judicial admission for the jury's consideration. WTC revives this argument in its post-trial motion, which the Court will address presently.

exchange for the pledged $3.7 million in bonds (but only until Charlie's death) with the benefits payable under the policies as collateral.  Although the Breslers acknowledged that the November 21, 2003 offer letter mentioned the possibility of future collateral, they argued that the letter's collateral language could only be understood in conjunction with Ianni's continuing representations preceding the signing of the Agreements.  Those representations, they said, led Charlie, and would have led any similarly situated client, to reasonably believe that security for the loans would be covered by the value of the Bresler Trust Policies alone, or would at most require Bresler to pay $44,000 annually to the ILIT.

The Breslers also stressed the fact that Paragraphs Two and Four of the template Collateral Security Agreement, which pertained to future collateral obligations in other of WTC's premium finance deals, had been "Intentionally Omitted" from the Pledge Agreement Charlie signed.

The Breslers further suggested that because Ianni stood to earn commissions upon consummation of the deal, he was willing to say whatever he needed to say in order to close the deal.  The Breslers laid particular stress upon the fact that, when sued by Ianni for commissions due, WTC specifically counter-claimed that Ianni had been misleading prospective customers of premium financing—Charlie included—to believe that any collateral requirements would be minimal.  The Breslers cited Ianni's letters and notes leading up to the November 21, 2003 letter, which contained no mention of collateral, and introduced proposals and deals between WTC and other prospective customers of premium financing plans in which the concept of future collateral had been discussed in considerably more definite terms.  Moreover, the Breslers argued that WTC benefitted greatly from the plan: Not only did it receive its own commissions (in addition to Ianni's and Wileczek's commissions on the policies) at the time the Agreements were signed;

it also received management fees pursuant to the IMA, and ultimately, of course, stood to have its loans repaid in full with interest out of the most certain and reliable source of all—the insurance policies on the lives of two aging individuals, Charlie and Fleur.

The whole deal, according to the Breslers, was that Charlie insurance would be arranged for himself and Fleur without burdening him, her, or his heirs with financial obligations.  What sense would it have made, they asked, for Charlie to agree that he and Fleur, after his death, should have to post millions of dollars in collateral each year over several years?

WTC's theory of the case was that Charlie and Attorney Shaiman were experienced individuals who understood complicated financial deals, including what the premium financing plan required.  WTC argued that, while several plans were discussed with Charlie and Shaiman throughout 2003, none was ultimately accepted, such that those proposals should have no bearing on the premium financing plan ultimately agreed to and what its terms should mean. WTC pointed out that the November 21, 2003 offer letter not only referred to a collateral requirement; it noted that future collateral was a possibility.  And even though Charlie initially rejected the idea of posting collateral, by signing the Agreements he did so with the understanding that collateral would be required in the future.

WTC suggested that it would never have agreed to a deal of the sort described by the Breslers, that is, one where loans of substantial magnitude would be made while only a minimal amount of collateral or no collateral at all would be required.  WTC argued that its premium financing plan contemplated a yearly discussion of both loans and collateral, wherein Charlie would decide how much he wanted WTC to lend to the ILIT each year and WTC would in turn tell Charlie how much collateral he would have to post.

The parties also vigorously debated damages.  By the time of trial, WTC had loaned approximately $14 million to the Bresler Trust, while, due to a lack of overfunding, the death benefits payable under the Trust Policies remained at $50 million.  If, as of trial, WTC were to have its loan repaid with interest, the Net-in-Trust owed to the Bresler Trust would approximate $36 million.

Robert E. Pugh, the Breslers' accounting expert, presented two sets of damages numbers. In the first set, he calculated what he called the present shortfall: the difference between what the Net-in-Trust owed to the Breslers would have been had WTC loaned $5.5 million per year versus the actual amount of the Net-in-Trust at the time of trial ($36 million).  In the second set, Pugh calculated the future shortfall: the difference between what the value of the policies would be if WTC loaned $5.5 million per year through the end of Fleur's life, based on mortality tables projected to occur in 2019, and what the value would be if WTC continued to only pay the minimum amount due on the premiums.  Pugh added those two sets up and offered two total damages calculations: (1) if WTC were to begin overfunding immediately, about $17.8 million ($10,668,687 to the date of trial and $7,119,129 shortfall in the future) and (2) about $19.5 million if WTC were only to make minimum payments in the future ($10,668,687 to the date of trial and $8,793,005 shortfall in the future).

Pugh testified that, in the report he prepared prior to trial, he had based his calculations, in part, on cost projections provided to him by WTC's accounting expert, Kevin Stephens.  Tr., Jan. 23, 7:23–25.  But at trial, WTC employee Patricia Wilson gave testimony as to actual costs incurred by WTC.  This caused Pugh, at trial, to revise his calculations downward based on WTC's late-delivered cost information.

WTC took to Pugh's calculations with hammer and tongs—both on cross-examination and through the testimony of its own expert, Stephens.  It questioned Pugh's assumptions regarding interest rates and the cost of the insurance policies, as well as several other calculations.  WTC did not, however, present its own estimate of damages, relying solely and exclusively on its challenge to Pugh's damages estimates.

In a special verdict, the jury reached the following conclusions: (1) WTC agreed to lend funds to cover the annual premiums for the Bresler Trust Life Insurance Policies for the duration of Charlie and Fleur Bresler's lives; (2) WTC's commitment was not contingent upon Charlie Bresler meeting WTC's demands for collateral each year; (3) WTC did not have discretion under the Agreements to establish an amount of collateral each year in exchange for loans to be made after the first year; (4) the Agreements required WTC to "overfund" the premiums during the joint lives of Charlie and Fleur, although the jury also found that the parties had not agreed to a specific amount of overfunding each year; (5) the parties agreed that the March 2005 transfer of $1.3 million was a collateral pledge, but that WTC breached the Agreements by requiring that pledge; (6) WTC breached the Agreements by failing to make loans each year to cover the premiums on the life insurance and by failing to overfund the Bresler Trust Policies after the first year of the policies; and (7) the Agreements obligated WTC to make premium payments for each year of the policies.

Having reached those conclusions, the jury effectively adopted Pugh's revised damages calculations.  It determined that WTC owed the Breslers either approximately $17.8 million if it immediately began overfunding the Bresler Trust Policies or approximately $19.5 million if WTC were only to make the minimum payments in the future.  The jury also concluded that

WTC should reimburse the Breslers $3.9 million of the $7.75 million through the end of 2014 Fleur would have spent to obtain replacement insurance policies, beginning in 2009.

## II.

The parties are now before the Court seeking various forms of post-trial relief.

### A.

WTC, for its part, moves for judgment in its favor as a matter of law pursuant to Fed. R. Civ. P. 50.  Alternatively, it asks the Court to amend the verdict, grant a new trial, and/or require remittitur pursuant to Fed. R. Civ. P. 59.  The Court begins with a review of the applicable standards.

### 1.

Judgment as a matter of law is proper if the district court determines "that a reasonable jury would not have a legally sufficient evidentiary basis to find" for the non-moving party.  Fed. R. Civ. P. 50(a).  However, "[b]ecause judgment as a matter of law deprives the non-moving party of a determination of the facts by a jury, it should be granted sparingly."[10]  *Knussman v. Maryland*, 65 F. Supp. 2d 353, 356 (D. Md. 1999).  Indeed, "judgment as a matter of law may be granted only if, viewing the evidence in a light most favorable to the non-moving party (and in support of the jury's verdict) and drawing every legitimate inference in that party's favor, the only conclusion a reasonable jury could have reached is one in favor of the moving party."  *Int'l Ground Transp. v. Mayor and City Council of Ocean City, MD*, 475 F.3d 214, 218–19 (4th Cir. 2007).

---

[10] "In diversity cases in which the sufficiency of the evidence to create a jury question is presented, this court resolves the issue based on the federal rule."  *Charleston Area Medical Center, Inc. v. Blue Cross and Blue Shield Mut. of Ohio, Inc.*, 6 F.3d 243, 247 (4th Cir. 1993); *Maxworthy v. Horn Elec. Service, Inc.*, 314 F. Supp. 899, 901 (D.Md. 1970).

Although the district court "should review the record as a whole, [it] must disregard all evidence favorable to the moving party that a jury would not be required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). "That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* (internal quotations and citation omitted). Even if the court were to view the evidence differently from the jury, "[i]f reasonable minds could differ about the verdict," the court is obliged to affirm. *ABT Building Prods. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 472 F.3d 99, 113 (4th Cir. 2006).

A Rule 59 motion for new trial may be and frequently is joined with a Rule 50 motion for judgment as a matter of law. Fed. R. Civ. P. 50(b). As to the Rule 59 motion, the court must set aside the verdict and grant a new trial if the verdict is (1) against the clear weight of the evidence; (2) based upon evidence that is false; or (3) will result in a miscarriage of justice, even though there may be substantial evidence that would prevent the direction of a verdict. *Pathways Psychosocial v. Town of Leonardtown, MD*, 223 F. Supp. 2d 699, 706 (D. Md. 2002) (quoting *Knussman*, 272 F.3d at 639 (4th Cir. 2001)). "Unlike the procedure under Rule 50(b), on a motion for new trial under Rule 59(e) a district court is permitted to weigh the evidence." *Id.* But the mere fact that evidence may be in conflict is not enough to set aside the verdict. The more sharply the evidence conflicts, the more reluctant the judge should be to substitute his judgment for that of the jury. Charles A. Wright, *et. al.*, *Federal Practice and Procedure* § 2806, at 84. Additionally, reconsideration of a judgment under Rule 59(e) is an extraordinary remedy that should be used sparingly. *Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998).

**2.**

WTC offers two basic arguments in support of its Motions for Judgment as a Matter of Law and for a New Trial.  Although it has filed two separate motions, WTC advances the same arguments both as a basis for judgment as a matter of law and as a basis for a new trial.[11]  The Court therefore addresses these arguments with respect to both motions.

**a.**

WTC argues first that the jury's verdict is irreconcilably inconsistent, which is to say there was no legally sufficient basis for it and it must be vacated or amended.  Secondly, it argues that the jury's finding that there was no requirement for Charlie to post collateral at WTC's discretion is against the clear weight of the evidence and, at a minimum, would result in a clear miscarriage of justice.

The Court begins with the argument of inconsistent verdict.  Typically, "[j]ury verdicts must be upheld if a fair reading of special verdict form answers can be reasonably harmonized in view of the evidence."  *Cox v. Collins*, 7 F.3d 394, 396 (4th Cir. 1993).  WTC notes, however, that although the court has a duty to harmonize a jury's answers, if "viewed in the most generous way, the answers are inconsistent with each other, a new trial is ordinarily required."  *Ladnier v. Murray*, 769 F.2d 195, 198 (4th Cir. 1985).

WTC's argument stems from a single answer on the verdict sheet.  In its answer to Question 4(b), the jury found that the parties did not agree to a specific amount of overfunding.  To WTC, this answer suggests a host of irreconcilable inconsistencies.  First, it says, the jury's finding that WTC breached its obligations by not overfunding $5.5 million each year but nevertheless providing damages based on that finding is irreconcilable with the jury's finding

---

[11] The exception, of course, is WTC's arguments in favor of remittitur as the basis for a new trial.

that there was no agreement as to a specific amount of overfunding.  Second, the jury's verdict is said to be inconsistent insofar as it found that WTC breached the obligation to overfund the Bresler Trust Policies despite finding the parties had no agreement as to a specific amount to overfund and despite the fact that the policies were in fact overfunded at the time of trial.  Third, the jury failed to find the existence of a material term of the premium financing plan (*i.e.*, the amount to be overfunded each year).  As a result, no enforceable contract should have been found and no damages should have been assessed against WTC for a breach.  Fourth, the jury's finding that WTC breached the premium financing agreement by failing to lend annual premiums is inconsistent with the finding that WTC has in fact lent enough money to keep the policies in force.

Although it does not acknowledge it forthrightly, WTC's argument is essentially that its understanding of the parties' obligations under the Agreements is correct and the jury's understanding of the parties' obligations is wrong.  The Court thus reviews the evidence to determine what a reasonable factfinder could reasonably have concluded regarding WTC's lending obligations under the Agreements, and in particular the extent to which the clear weight of the evidence demonstrates any obligation on Charlie's part to pledge future collateral.  WTC also appears to argue that because a material term is lacking, there can be no enforceable contract at all between it and the Breslers.

Taking the last argument first: Insofar as WTC is really arguing that there can be no contract because a material term is lacking, the argument merits little discussion.  Clearly there can be no dispute that the parties agreed that WTC would provide funding for the purchase of insurance on the lives of Charlie and Fleur; that WTC in fact loaned money to the life insurance trust that WTC set up to purchase and service the life insurance policies; that the ILIT purchased

policies on the lives of the couple in the face amount of $50 million; and that Charlie agreed, at least provisionally, to post and did post $3.7 million in bonds as collateral for WTC's first-year loan. Even if the jury found that there was no agreement as to a particular amount of overfunding, it is clear that it could find that WTC at a minimum obligated itself to lend as much as needed to keep the originally purchased policies in effect over the lifetimes of Charlie and Fleur.

But it is entirely possible to harmonize the jury's finding that there was an agreement to overfund with its finding that the parties did not agree upon a specific amount of overfunding. The jury concluded (or could have concluded) that the premium financing plan required WTC to loan the Breslers $5.5 million annually for the remainder of Charlie and Fleur's lives for the purpose of making minimum payments on the Bresler Trust Policies as well as for the purpose of overfunding those policies. The $5.5 million annual obligation could be divided into two components: one would be a variable minimum amount to keep the basic policies from lapsing and the remainder would go towards overfunding. Because the minimum premium payments changed from year to year, the portion of the $5.5 million that would be devoted to "overfunding" would also change. Thus, the jury's conclusion that there was no agreement to a specific amount of "overfunding"—even though WTC agreed to lend $5.5 million per year—was not necessarily inconsistent. Had WTC loaned $5.5 million each year, it would have consistently overfunded the policies in at least some amount to be determined each year, after the minimum payments to keep the policies from lapsing had been covered.

In view of this, the Court rejects the proposition that the premium financing plan lacked a material term. WTC's obligation under the Agreements was to loan $5.5 million per year through the lives of Charlie and Fleur Bresler, with that amount divided between the variable basic policy

premiums and the cost of overfunding.  In exchange, WTC would have its loans repaid with interest.

Finally, WTC's suggestion that there was never a breach because the policies have in fact remained in force and have been overfunded is simply not true.  The evidence clearly showed that, after Year One, WTC flatly refused to pay $5.5 million each year, which the jury concluded it had agreed to do. WTC argues that it would never have made the deal as described by the Breslers, lending such a large amount of money with only the initial $3.7 million standing as collateral.  But this, of course, ignores the fact that the death benefits payable under the Bresler Trust Policies were the ironclad source for repayment of any loans and interest.  The fact that WTC may have in the interim made minimum payments to assure the policies would not lapse— which it has done under protest—does not excuse its breach, because it agreed to make those payments on the policies (and arguably even overfund them) without having the right to insist on collateral.

### b.

At the heart of this litigation is whether Charlie was obliged to post collateral WTC's loans and, if so, how much it was to be over what period of time.  Again, the jury found that there was no agreement that Charlie would have to post any collateral beyond, at least provisionally, the $3.7 million in bonds the first year, and that WTC breached the agreement by insisting that there had to be collateral.

WTC, relying principally on the Pledge Agreement, argued to the jury that a long-term collateral obligation on the part of Charlie and Fleur was unmistakable and that that was all that needed to be said.

But the jury's rejection of that proposition was entirely reasonable.

The Pledge Agreement itself demolishes WTC's contention, particularly the "Intentionally Omitted" paragraphs from WTC's template agreement dealing with future collateral obligations.  As a basic proposition of contract interpretation, the striking of those terms clearly supports the inference that there was to be no future collateral obligation.  For a court "to read into an agreement a contract term that was expressly considered and rejected by the parties in the course of negotiations would be to create new contract rights, liabilities and duties to which the parties had not assented." *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *7 (Del. Ch. June 21, 2012).   Additionally, the IMA provided that, upon notice of Charlie's death, WTC "shall deliver to Principal, or the executor or administrator of Principal's estate . . . all of the funds held by it hereunder."  IMA §V.d.  Though not explicitly, this language supports the inference that Charlie did not agree to future collateral obligations because, after his death, the $3.7 million in bond (and whatever other assets) would revert to his estate.

There was considerable additional evidence in support of the jury's finding that future collateral was to be either non-existent or minimal.  None of the three Agreements signed by Charlie on January 8, 2004 (the Trust Agreement and IMA), and January 15, 2004 (the Pledge Agreement), contain an integration clause to the effect that those documents constituted the entire agreement of the parties.  In the absence of an integration clause, parol evidence was clearly admissible to inform what, objectively speaking, a reasonable understanding of the terms of the Agreement would be, especially where, as here, there was ambiguity as to just what was intended as to this particular term.  *See Galantino v. Baffone*, 46 A.3d 1076, 1080 (Del. 2012) ("The parol evidence rule bars the admission of evidence extrinsic to an unambiguous, integrated written contract for the purpose of varying or contradicting the terms of that contract.").

The parol evidence in this case concerning whether or not collateral was required was substantial.  It consisted of letters Charlie and Attorney Shaiman received from WTC throughout the 2003 negotiations, which included spreadsheets contemplating a yearly contribution into a Bresler ILIT to pay the annual premiums plus the maximum in allowable funding, but which made no mention of collateral beyond an obligation on Charlie's part to make an initial $500,000 gift into the ILIT and annual Crummey gifts. *See* PTX 2C, 5, 6.  Additionally, Charlie testified in his video deposition that Ianni continuously represented to him that any future collateral obligations would be minimal.  That testimony was reinforced by Ianni's own notes of calls between him, Charlie, and Shaiman, which were totally bereft of any mention of collateral obligations.  It was particularly fortified by WTC's own counterclaims against its own former Vice President Ianni in Delaware court, where it alleged that he misrepresented the necessity of future collateral obligations to premium financing customers—specifically naming Charlie among them.

At the same time, while WTC cites its November 21, 2003 offer letter in support of its insistence that collateral obligations were definitely agreed upon,[12] the letter is artfully vague: "[t]he amount of needed collateral going forward obviously will depend in part on the aggregate cash surrender value of the trust's assets (namely, of the insurance) and will be reviewed periodically."  DTX 4.  Further, "[t]he collateral, of course, becomes unrestricted when the cash values of the policies in trust sufficiently exceed the trust's outstanding loan or when the trust's loan is repaid at death from the insurance policies' death benefit."  Maybe collateral, maybe not, but nothing definite.

---

[12] Interestingly, although WTC generally opposes the use of parol evidence, in this instance it relies on this pre-Agreement letter in support of its interpretation of the later-signed Agreements.

At a minimum, reasonable minds could differ as to whether a future collateral obligation was part of the Agreement: to this extent WTC's Motion for a New Trial crumbles.  The jury's finding is neither against the clear weight of the evidence nor does it result in a miscarriage of justice.  So much, then, for WTC's Motion for New Trial on theses bases.  The jury could fairly conclude that no collateral was required of Charlie (leaving aside, for the moment, the fate of the initial posting of $3.7 million in bonds the first year and $1.3 million in cash the second year).


**3.**

WTC also submits that the Court committed prejudicial errors that tainted the jury's verdict and mandate a new trial.  The alleged errors include improperly admitted evidence as well as improperly omitted instructions and questions posed to the jury on the special verdict form.

**a.**

As to the allegedly improper evidentiary decisions:

First, the Court is said to have erred by not excluding evidence that was highly prejudicial and lacking in probative value.  This included evidence related to Ianni's Delaware lawsuit in which WTC counterclaimed as to Ianni's misleading of WTC premium finance clients (including Charlie) about collateral requirements under premium financing plans, evidence that WTC and its representatives received commissions following consummation of the Bresler deal, and evidence of WTC's communications with other premium finance customers.  Further, WTC argues that the Court erred by allowing parol evidence with respect to the written Agreements.

This is the standard:

"The Court may, on motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a).  This may include an allegation that evidence was improperly admitted during trial and prejudiced the moving party's rights.  *E.g.*, *Peterson v. Calmar S.S. Corp.*, 296 F. Supp. 8, 11 (E.D. Pa. 1969); *cf.* Fed. R. Civ. P. 61.

The Court is satisfied that its evidentiary rulings were proper.[13]

This case in some ways is fairly simple.  It asks only: What agreement did the parties reach and to what extent did they perform under it?  WTC challenges the admission of evidence that bears directly on those issues.  *Cf.* Fed. R. Evid. 401.  The Agreements contained no integration clause, nor did they address WTC's specific lending obligations.  Tr., Jan. 24, 2014, at 16:12–15.  Relevant parol evidence, which is to say all the pre-signing correspondence and oral representations, was therefore admissible insofar as it was relevant and did not contradict the Agreements.  *Wuchenich v. Shenandoah Mem. Hosp.*, 215 F.3d 1324 (4th Cir. 2000); *Husband (P.J.O.) v. Wife (L.O.)*, 418 A.2d 994, 996 (Del. 1980).

Limited evidence of other similar transactions was also admissible if the Breslers could show "an established procedure or policy with regard to a form or format for communicating to prospective premium finance clients . . . pertaining to the necessity vel non of posting collateral and/or overfunding of insurance."  Order regarding Motions *in Limine*, Paper No. 552 at ¶ 6. The Court did a careful review and entertained argument of the similar agreements outside the presence of the jury and concluded that those agreements, especially the two key paragraphs dealing with collateral obligations "Intentionally Omitted" from Charlie's agreement, spoke

---

[13] As addressed in a separate opinion to be filed contemporaneously herewith, the Court's decision to admit the expert testimony of Plaintiffs' Robert Pugh was likewise proper.

directly to what the parties in this case may have reasonably intended with respect to collateral obligations.

WTC's allegations regarding what Ianni may have said to Charlie were also properly admitted. Ianni, at all times, was WTC's agent acting within the scope of his apparent authority. Fed. R. Evid. 801(d)(2)(D). This bore directly on the parties' understanding of the Agreements.

WTC's counter-claim citing Ianni's misconduct in minimizing collateral obligations in Ianni's own suit against it was a judicial admission bearing on a core issue of the present case. *See In re United Mine Workers of America Empl. Ben. Plans Litig.*, 782 F. Supp. 658, 674 (D.D.C. 1992) ("Although a judicial admission is binding only in the case in which it was made, a court may consider a judicial admission as evidence in another case.").

Evidence of the commissions Ianni and Wileczek received was relevant and admissible, insofar as it suggested that both of them had every incentive to gloss over problematic terms in order to close a deal with Charlie, otherwise they might lose out on a substantial payday. WTC has provided no valid reason why this relevant evidence should have been excluded.

### b.

"On a Rule 59 motion, the court can set aside the verdict and grant a new trial only if the erroneous instruction is prejudicial and would result in a miscarriage of justice." *Pathways Psychosocial*, 223 F. Supp. 2d at 707.

WTC suggests the Court committed reversible error by refusing to instruct the jury on the Breslers' duty to mitigate damages, and for striking WTC's question regarding the duty to mitigate from the verdict form. It argues that this omission foreclosed the possibility of a significant defense, which led the jury to improperly award Fleur an additional $3.9 million in damages for the replacement policies she obtained, without offsetting the value of those policies

against the damages she alleged WTC owed her.  WTC also argues that the Court should have instructed the jury as to the Statute of Frauds defense.  In its estimation, the lending agreement was "not primarily for personal, family, or household purposes" under 6 *Delaware Code* § 2714(b) and therefore could not have been the subject of an oral contract.  Finally, WTC says the Court should have submitted a verdict question regarding contract modification.

A court may give a jury instruction if the evidence in the record supports it.  *See Jones v. Griffey*, 104 Fed. App'x 840, 844 (4th Cir. 2004); *GTE Products Corp. v. Kennametal, Inc.*, 772 F. Supp. 907, 917 (W.D.Va. 1991).  Additionally, when creating a verdict form, "[i]t is settled in this jurisdiction that the formulation of issues and the form of interrogatories is committed to the sound discretion of the trial judge."  *Horne v. Owens-Corning Fiberglas Corp.*, 4 F.3d 276, 284 (4th Cir. 1993) (quoting *Klein v. Sears Roebuck & Co.*, 773 F.2d 1421, 1426–27 (4th Cir. 1985)).  In evaluating the verdict form, a reviewing court considers "several factors, including whether the interrogatories adequately presented the contested issues to the jury when read as a whole and in conjunction with the general charge, whether submission of the issues to the jury was fair, and whether the ultimate questions of fact were clearly submitted to the jury."  *Id.*

Regarding mitigation, the burden to prove that losses could have been avoided through reasonable expense and effort is on the defendant.  *Chastang v. Flynn & Emrich Co.*, 381 F. Supp. 1348, 1350 (D. Md. 1974).  Here, WTC presented no evidence to support a mitigation instruction.  *See* Tr., Jan. 28, 2014, at 49:24-53:8.  At trial, it suggested only two possible mitigations: (1) that the Breslers should have agreed with its view of the Agreements and provided additional collateral or (2) that the Breslers should have accepted a loan from Wells Fargo, which had its own collateral payment obligations of about $17 million.  Neither of these options was in the least bit plausible or without substantial cost.  *See Am. Gen. Corp. v.*

*Continental Airlines Corp.*, 622 A.2d 1, 11 (Del. Ch. 1992) (explaining the plaintiff has a duty to mitigate with "reasonable effort and without substantial risk of loss"); *see also Circuit City Stores, Inc. v. Rockville Pike Joint Venture Ltd. Partnership*, 829 A.2d 976, 990 (Md. 2003) (noting a plaintiff's duty to mitigate "with reasonable endeavors and expense and without risk of additional substantial loss or injury").

The first suggestion—that the Breslers should have accepted WTC's view of the Agreements—is not a mitigation argument.  It in effect says, because you didn't agree with us, you cannot recover.  As for taking the Wells Fargo loan and posting $17 million in collateral, it was precisely the requirement of posting collateral that the Breslers were trying to avoid in the present case.  Why would it have been reasonable for them to post collateral in an amount greater than WTC itself was demanding (in the Breslers' view, wrongly)?

Nor did the evidence support an instruction on the Statute of Frauds defense.

"Multiple writings will satisfy the statute of frauds if they (a) reasonably identify the subject matter of the contract, (b) indicate that a contract has been made between the parties or an offer extended by the signing party and (c) state with reasonable certainty the essential terms of the unperformed promises in the contract."  *Olson v. Halvorsen*, 982 A.2d 286, 293 (Del. Ch. 2008) (internal quotations omitted).  Here, in the absence of integration clauses in any of the final written Agreements, there were numerous writings presented that individually satisfied the Statute of Frauds requirement.  Moreover, as the Breslers cogently point out, the Statute of Frauds was not available where—as here—the parties in fact agree that they had an agreement of some sort.  *Wolf v. Crosby*, 377 A.2d 22, 26–27 (Del. Ch. 1977).

WTC's reference to the Delaware Statute of Frauds is no more persuasive.  6 *Del. C.* § 2714(b) provides that a loan "in an amount greater than $100,000, not primarily for personal,

family, or household purposes . . . shall be invalid unless it or some note or memorandum thereof is in writing and subscribed by the party to be charged." Again, of course, there actually are writings in this case, which makes the entire reference to the Statute of Frauds irrelevant. Even so, WTC argues that because in its internal documents it referred to the loans as "commercial loans," the Delaware statute invalidates the "oral" agreement in this case. But the Court concluded at trial and re-affirms now that the loans in this case undoubtedly were "primarily for personal, family or household purposes," not "commercial" in nature, and therefore 6 *Delaware Code* § 2714(b) would be inapplicable in any event.

WTC also challenges the Court's failure to submit to a question on the Special Verdict Form regarding contract modification. It notes that the jury concluded that WTC took the position that it required collateral for future loans, and that Charlie agreed to pledge the $1.3 million in 2005 as collateral, but it was not asked to determine on the Verdict Form whether, by posting the $1.3 million, Charlie was agreeing to a modification of the Agreements that future collateral would be required. According to WTC, this also led to an inconsistent finding: that even though Charlie provided the additional collateral, the jury found that WTC breached the agreement by requesting the additional collateral.

The Court, however, did provide an extensive instruction on modification:

Understand, however, the parties are free to modify an agreement already reached. That is, they can agree to change a term or terms. And a change in the previously agreed upon contract would have to meet the elements of the contract that I spoke to you about earlier, offer of acceptance, and specifically terms that are sufficient to be understood.

Evidence of a party's agreement to modify a previously agreed upon contract may be found in express language of the parties and/or in the manner in which the parties actually conduct themselves following the reaching of the original agreement with respect to the term or terms in issue.

Tr. Jan. 28, 2014, at 43:15–25.

The questions on the verdict form effectively presented the issue for the jury's consideration: Taking all the contract instructions, including possible modification, together, the jury could well find that WTC breached the Agreements by requesting the additional collateral. without a specific question regarding modification.  In other words, it is apparent that the jury did not believe the $1.3 million "collateral pledge" in 2005 amounted to modification of the contract.  Rather, the jury obviously concluded that the parties were engaged in a hotly contested dispute over the propriety and amount of collateral—and that the $1.3 million "pledge" was entered into simply as a "patch" pending the outcome of the litigation, precisely as Sidney testified.  Certainly there was no evidence in the case suggesting that the parties ever modified much less settled the issue of collateral.[14]

**4.**

As to damages, WTC argues that the jury's award was against the clear weight of the evidence and therefore warrants a new trial and/or remittitur.  It begins by suggesting that the jury arrived at an improper amount of damages by failing to grasp the errors in Pugh's supposedly expert testimony.  In support of this proposition, WTC reprises the same arguments it made to the jury regarding Pugh's calculations.  Next, WTC argues that the jury's award of future damages was entirely speculative since it relied on a six-year life expectancy for Fleur Bresler and provided no offset should Fleur die before 2019.  Finally, WTC submits that the jury's award of damages for Fleur's replacement policies is duplicative and results in an improper windfall for the Breslers.  According to WTC, not only has it been assessed damages to

---

[14] Similarly, as noted earlier, the evidence was essentially incontrovertible that, as a patch, the "pledge" of $1.3 million as a patch did not amount to a waiver by Charlie of his claim that no future collateral was required.

make the Breslers whole; it will also be paying for Fleur's replacement policies, which will provide her with an added death benefit of $17.5 million, for which WTC will not receive an offset. This, WTC argues, amounts to punitive damages, which are improper in a contract dispute.

"[W]here a verdict is so excessive that it cannot be justified by anything in the record . . . it is the duty of the judge to set it aside." *Holman v. Mark Indus., Inc.*, 610 F. Supp. 1195, 1204 (D. Md. 1985). Additionally, the standard for whether a motion for remittitur should be granted has been variously stated as "whether the verdict is 'grossly excessive,' or 'shocks the conscience of the court,' or is 'inordinate,' or 'outrageously excessive,' or even simply 'excessive.'" *Exxon Mobile Corp. v. Ford*, 71 A.3d 105, 135 (Md. 2013).[15] The trial court has broad discretion to make this determination. *Hebron Volunteer Fire Dept., Inc. v. Whitelock*, 890 A.2d 899, 904 (Md. 2006). Even if the court grants remittitur, it must determine the "highest amount that a reasonable jury would award to fairly compensate a plaintiff for his or her loss based on [the] evidence." *Id.* at 912.

The Court finds no problem with the jury's damages award. Sufficient evidence was presented to it, and its determinations were not against the weight of the evidence.

WTC made the same arguments regarding the reliability of Pugh's calculations to the jury as it does now to the Court. Pugh's numbers relied on projections originally produced by WTC's expert, Kevin Stephens. When WTC provided updated cost figures, essentially at trial,

---

[15] A federal court exercising diversity jurisdiction must apply the substantive law of the forum state, *Gulf Ins. Co. v. Davis*, 65 F.3d 166 (4th Cir. 1995), unless the parties have arrived at their own agreement regarding choice of law. Here, the Agreements contain Delaware choice of law provisions. But those provisions apply only to the interpretation of the contracts. *See* Pledge Agreement ¶ 9; IMA § VI. The question of excessiveness *vel non* of damages or remittitur is not a question about the interpretation of the contract. Accordingly, Maryland law, as the law of the forum state, applies. *Atlas Food Sys. and Svcs., Inc. v. Crane Nat. Vendors, Inc.*, 99 F.3d 587, 593 (4th Cir. 1996) ("Thus, the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." (internal quotation omitted)).

Pugh—based on those new numbers—actually revised his calculations downward.  The jury awarded the damages as revised by Pugh.  Moreover, Pugh's calculations were largely similar to those WTC had provided Charlie Bresler in 2003 regarding the possible future value of the policies it was touting.  To the extent that Pugh used present value calculations and interest rate projections formulated differently from those WTC would have the jury use, Pugh acknowledged that the differences could lead to a further variance in damages between $4 and $6 million.  Still, the jury heard WTC's arguments and rejected them.  Its decision was in no way "grossly excessive," did not "shock the conscience," and was not "inordinate" or even "excessive."  There is no reason for the Court to grant a new trial and/or remittitur. Pugh sat through four direct and three cross examinations. As further elucidated in the Court's companion opinion to the present opinion, the jury had ample opportunity to evaluate Pugh's calculations and ultimately to credit them.

WTC's argument regarding Pugh's projections of future damages is likewise unavailing. Courts regularly admit mortality tables to help assess damages.  *E.g.*, *Asbestos Litig. Pusey Trial Grp. v. Owens-Corning Fiberglass Corp.*, 669 A.2d 108, 114 (Del. 1995); *Byrum v. Maryott*, 337 A.2d 142, 143 (Md. App. 1975) ("Courts in Maryland have long recognized the propriety of using mortality or life expectancy tables to give some guidance to the jury . . . ").  WTC cites no authority for the proposition that the jury should have offset its damages award to account for the possibility that Fleur might die before 2019, and the Court is aware of no authority that holds that a jury must do so.  There is no basis to overturn the jury's verdict and order a new trial.

As for the jury's award of $3.9 million in damages for the premiums Fleur paid for $17.5 million in term life insurance beginning in 2009, WTC argues (1) that Fleur is not entitled to any

damages at all; (2) that the amount of damages ordered, $3.9 million, was irrational, and (3) in any case, no offset was given WTC for the face amount of the policies, *i.e.*, $17.5 million.

The propriety of the jury's award, in the first instance, depends upon the extent to which these expenditures may be considered consequential out-of-pocket damages incurred as a result of WTC's actual or threatened breach. *See Pharm. Prod. Dev., Inc. v. TVM Life Science Ventures VI, L.P.*, 2011 WL 549163, at *7 (Del. Ch. Feb. 16, 2011) ("Consequential damages . . . are defined as damages that do not flow directly and immediately from the act of the breaching party, but only from some of the consequences or results of such act but were nonetheless reasonably foreseeable or contemplated by the parties at the time the contract was entered into as a probable result of the breach.").

According to the trial testimony, the total of the premiums for Fleur's separate insurance paid through 2014 would have been $7.75 million ($6.25 million by the time of trial and another $1.5 million to the end of 2014). Since this was term life insurance, the policies had no cash surrender value.

As for the damages awarded based on the costs Fleur incurred to obtain the replacement policies:

The evidence showed that the policies were acquired as a result of WTC's breach. In 2009, when Fleur took out the replacement policies, Sidney testified that WTC had put no money into the ILIT's policies since 2007. Tr. Jan. 22, 2014, 12:18–14:3. WTC had refused to commit to making future payments on the policies, even after the Breslers informed it of their intention to seek the replacement policies if WTC would not commit to making future payments. *Id.*

Sidney testified that Fleur would not have gotten the replacement policies if WTC had promised to continue making payments on the existing policies. *Id.*[16]

It was also reasonably foreseeable at the time the parties agreed on the premium financing plan, especially given the substantial death taxes they faced, that the Breslers would need to seek replacement life insurance should WTC refuse to loan any money for the purpose of maintaining the Trust Policies.  The family was concerned, according to Sidney, that at Fleur's age it was becoming increasingly difficult for her to get insurance.   Presumably she might be left without any source of funding to cover her own substantial estate taxes, something she and Charlie had counted on the agreement with WTC to provide.

How then can the jury's award of $3.9 million as damages for the cost of the term insurance be explained?  The trial testimony was that, through 2014, Fleur would have paid $7.75 million in premiums.  As term policies, they had no cash value.  But one of WTC's witnesses, Wileczek, testified that Charlie and Fleur's life policies on the open market might sell for 22% of face value (quite possibly he meant only to refer to the policies WTC was funding, although that is not clear). *See* Tr., Jan. 15, 2014, 120:18–121:4.  Twenty-two percent of $17.5 million (the face amount of Fleur's term life policy) is $3.85 million.

Subtracting the $3.85 million presumed market value of the term policy from the $7.75 million Fleur would actually have paid in premiums through 2014 results in $3.9 million, precisely what the jury awarded.

Apart from this, the jury's award actually favored WTC.  Assuming no market value could be attributable to Fleur's term insurance at all, WTC's liability might have been the full

---

[16] The fact that WTC may have eventually done so—under protest—is irrelevant.  The question is whether WTC's threats at the time gave Fleur reasonable apprehension that the loans might cease altogether and the policies lapse.

$7.75 million Fleur would have paid through 2014.   In that sense, right or wrong, WTC benefitted from an offset with respect to this particular item of damages.

Finally, there is the matter of what offset, if any, WTC would be entitled to as far as the face amount of the term policies, $17.5 million, is concerned.   The answer is none at all.   These were term policies with fixed death benefits, which have yet to be paid, because Fleur is still alive.   She may well decide not to renew the policies for the next term, in which case they will lapse and there will never be death benefits.   But even if Fleur were to choose to pay the premiums in the future, that is not a matter of WTC's concern.   WTC's liability ended with the jury's consideration of what Fleur actually had to pay as premiums through 2014.   That decision brought an end to Fleur's claim for damages related to the replacement policies.   She can claim no more, and WTC can have no further liability for the premiums if Fleur chooses to continue them.   But WTC also has no claim on the death benefits, based on the possibility that Fleur might choose to renew the policies in the future.

In sum, the Court rejects WTC's suggestion that the damages award for Fleur's replacement policies was clearly against the weight of evidence or occasions a miscarriage of justice.   WTC's claim to an offset for the face amount of Fleur's replacement life insurance was rejected by the jury and is rejected by the Court.[17]

### III.

WTC has moved for several other forms of post-trial relief.   It has requested an order (1) denying the Breslers' request for the return of $5 million in collateral pledged by Charlie ($3.7

---

[17]   WTC suggests that the damages awarded for Fleur's replacement policies improperly flow to the Breslers, rather than the entity that bore the costs of those policies (*i.e.*, Bresler Family Investors, LLC ("BFI")).   The Breslers point out that BFI is their asset. For the same reasons set forth in the Court's companion opinion regarding who is the real party in interest in this litigation, this argument is not a reason to set aside the jury's verdict, grant a new trial, and/or order remittitur.

million + $1.3 million); (2) declaring that WTC may satisfy its outstanding loan balance, including any accrued interest, fees, and costs out of the proceeds of the Bresler Trust Policies upon the death of Fleur Bresler; or upon the sale, surrender, or disposition of the policies; or upon an event of default; or under the terms of the Trust Agreement, Collateral Agreement, or promissory note; (3) declaring the primacy of WTC's perfected security interest in the assets of the collateral account enabling WTC to enforce its liens thereon in full or partial satisfaction of the outstanding loans to the Bresler Trust; (4) permitting WTC to enforce the terms of the Promissory Note and the Pledge Agreement between WTC as Trustee and WTC as Lender, if there is an event of default; and (5) freezing the assets of the collateral account pending resolution of the post-trial motions, including any rights the parties may have to reconsideration or appeals. *See* Motion for Other Relief (Paper No. 617) at 17-18.

### a.

WTC argues that the Breslers seek to exploit an unrelated provision of the IMA, which terminates WTC's role as investment adviser upon Charlie's death, essentially nullifying the Pledge Agreement and WTC's security interest in the collateral.  WTC suggests that the three Agreements should be read together, and that the premium financing structure was designed to survive beyond Charlie's death.  This structure, it says, contemplated Charlie posting collateral that would be returned only after WTC had been repaid its loans out of the proceeds of the Bresler Trust Policies.  WTC argues that nothing in the jury's verdict disturbed Charlie's initial pledge of $3.7 million in collateral as security for WTC's loans nor his subsequent $1.3 million pledge in 2005.  Moreover, WTC argues that it has a perfected security interest in the collateral account, and that the Court should declare that it retains first lien priority status so that it may recover from the collateral account in the event the Bresler Trust Policies do not repay its loans.

The controlling consideration, of course, is the jury's finding that WTC had no right to demand collateral in the first place.  *See* Special Verdict Form (Paper No. 589), Response to Question 7.

The Breslers further respond that the language of the IMA is unambiguous and provides that the IMA terminates upon notice of Charlie's death, and that WTC "shall deliver to [Charlie], or the executor or administrator of [Charlie]'s estate, as the case may be, all of the funds held by it hereunder, if any, upon receiving an appropriate receipt therefor."  IMA § V.d.  According to the Breslers, the IMA does not require WTC to return any security interest it may hold in the Bresler Trust Policies themselves, but it does require the return of any funds in the Investment Management Account.  The Breslers suggest that nothing in the Pledge Agreement contradicts the IMA's plain language, and that the two contracts are easily harmonized: the funds in the account serve as collateral until Charlie's death.  At that point—which would in effect be halfway through the premium financing plan—the policies themselves become the sole collateral.  The Breslers oppose any set-off or declaratory judgment in WTC's favor, reasoning that it is not entitled to equitable relief inasmuch as the jury concluded it breached the Agreements and because there remain unresolved fraud and fiduciary duty claims.

As to the security interest, the Breslers argue that WTC's claim cannot trump its express obligations under the Agreements.  *See* 6 *Del. C.* § 9-339 ("This section makes entirely clear that a person entitled to priority may effectively agree to subordinate its claim.").  The Breslers argue that that is precisely what occurred here: WTC agreed to eventually surrender its interest in and possession of the funds in the investment account.

The Court agrees with the Breslers.

"It is well settled that where claims at law and in equity are joined and the legal claims are tried separately by a jury, the jury's verdict operates as a finding of fact binding on the trial court in its determination of the equitable claims." *Dybczak v. Tuskegee Inst.*, 737 F.2d 1524, 1526–27 (11th Cir. 1984). Here the jury concluded that WTC breached the Agreements by insisting that Charlie pledge collateral for any year in which WTC might agree to lend funds for the premium payments on the life insurance. The "collateral" in this case came to WTC at two points in time: $3.7 million in bonds was pledged in 2004 and $1.3 million was pledged as a "patch," pending resolution of the dispute, in 2005.

The jury's finding mandates that the Court order the return of the $3.7 million, concededly posted as collateral in 2004, since not only did the IMA clearly require the return of that amount on the death of Charlie, but, again, WTC was found not to have had the right to request any collateral in exchange for loans in the first place.

As for the $1.3 million in the second year, the parties unquestionably understood that that was to be a "patch" until their dispute over collateral could be definitely decided by agreement or litigation. Since the jury found that the Breslers were correct that no future collateral was required, the Court has no difficulty concluding that the $1.3 million collateral "patch" must also be returned to Charlie's Estate.

Much of the dispute in this case stems from vague or absent language of the Agreements regarding the parties' respective obligations, and has necessitated reference to parol evidence to determine what should reasonably be inferred as to what the Agreements required. In this instance, however, there is clear language outlining WTC's obligation: upon receiving notice of Charlie's death, it must return all the funds held in the collateral account that WTC was

41

managing.   IMA § V.d.   Given the plain and unambiguous language, no reference to parol evidence would ordinarily be necessary.

But indulging WTC for a moment: It argues that each of the three Agreements was signed contemporaneously and therefore the three should be interpreted together.   *See E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1115 (Del. 1985).   Thus WTC argues that, although the IMA contains the provision regarding the return of property upon Charlie's death, the Pledge Agreement pledges the $3.7 million in bonds (held in Account Number 64920-0) as collateral and provides further that the Pledge Agreement "shall be binding upon the heirs, executors, administrators, and assigns of [Charlie]."   PTX 15 ¶ 8.   Fair enough: But given the arguable ambiguous language of the Agreements, the Court (and the jury) could fairly look to parol evidence in an effort to resolve the alleged inconsistency between the two provisions of the Agreements.

The Court concludes that parol evidence confirms the Breslers' view of the Agreements. As noted earlier, WTC, through Ianni, represented to Charles and Attorney Shaiman throughout negotiations that any collateral obligation on Charlie's part would be minimal.   When Charlie was first presented with the offer that required a $3.7 million-in-bonds obligation, he testified he "went up the wall" and "probably hit the ceiling."   He stated further that at that point he was disinclined to go through with the premium financing plan altogether.   It was only upon subsequent discussion with Ianni and Ianni's assurances that the $3.7 million would come back to Charlie as the value of the policies increased that Charlie acceded to WTC's offer.   The Court finds that Ianni's assurances were not inconsistent with the language of the IMA, which contemplated a return of the funds held in the collateral account upon Charlie's death, which is

to say, when a substantial step towards the ultimate payout under the premium financing plan would have occurred.

The Court therefore rules that WTC is obliged to return all the assets held in the collateral account, a total of approximately $5 million ($3.7 million in bonds and $1.3 million in cash).[18] As such, the return of the funds does not trigger a default permitting WTC to immediately seek repayment of its loans.  WTC needs to be reminded—once again—that it lost this case.  It will be entitled to recoup its loans and interest when the Bresler Trust Policies mature upon Fleur's death.  Since the Court is addressing all pending post-trial motions at this time and will enter final judgment on the contract claims, it finds no reason to freeze the assets in the collateral account.  In fact, should WTC decide to appeal all or part of this case, the Court will consider setting an appropriate appeal bond at that time.

At this juncture, the Court finds all further requests by WTC to define the terms of the Agreement or its rights thereunder both premature and speculative.

### IV.

The Breslers also seek post-trial relief.[19]

They ask the Court to order WTC to continue funding the Bresler Trust Policies through the life of Fleur Bresler.  Specifically, they ask that either WTC be ordered to continue to lend the ILIT $5.5 million annually (to fund and overfund the policies) or that WTC be ordered to at

---

[18] The parties have not provided any evidence of the current value of the assets held in the collateral account.  Presumably, the value of the assets has changed since initially pledged, both with respect to the value of the bonds and any accretions to them since the first year and as to any accumulated interest on the $1.3 million cash payment since the second year.  As set forth in the Order that accompanies this Opinion, the parties will be directed to advise the Court within 30 days what the precise value of the assets held in the collateral account is, after which the Court will determine the precise amount to be awarded in cash and/or kind.

[19] The Breslers originally requested that the Court adjust some or all of the awards in their favor upwards in order to cover any taxes that may be imposable on the awards, what the parties have referred to as a "gross-up."  The parties have since requested that the Court defer addressing that request to allow them to develop their own mechanism to address any tax issues.  *See* Order Granting Consent Motion for Deferral of Claim of Plaintiff Estate of Charles S. Bresler for Tax Gross-Up From Breach of Contract Verdict.  Paper No. 652.

least make the minimum payments necessary to keep the Bresler Trust Policies from lapsing. Under the first scenario, the Breslers would receive the damages the jury awarded as set forth in Special Verdict Question 11(c): $7,119,129.  Under the second, they would receive the damages awarded as set forth in Special Verdict Question 11(d): $8,793,005.

The Breslers argue that specific performance is entirely consistent with the jury's special verdict, in which it concluded that WTC agreed to overfund the Bresler Trust Policies through the lives of Charlie and Fleur Bresler.  The Breslers suggest that specific performance would not duplicate damages awarded by the jury because the jury verdict only addresses the shortfall of value of the policies.  The Breslers submit that the jury's damages calculations were clearly based on the assumption that WTC would continue making payments on the Bresler Trust policies—either total payments at the rate of $5.5 million per year or continual annual amounts to keep the policies in force.  The Court, they urge, should require WTC to continue making loans as a fair, reasonable, and certain term of the Agreements.

WTC counters that specific performance is inappropriate because the Breslers have an adequate remedy at law,  suggesting that they have already received that legal remedy in the form of damages.  The Breslers elected monetary damages rather than specific performance and even the Breslers conceded at trial that specific performance would not be available if they received a money judgment.  *See* Tr., Jan. 23, 2014, at 81:15–17.  Since the Breslers, according to WTC, have already received a windfall judgment, ordering specific performance would amount to the double counting of damages.  Finally, WTC reverts to the argument that the premium financing plan lacks a material term (namely, the amount to be overfunded) such that the Court cannot possibly order specific performance.

44

The Court finds that the Breslers are entitled to specific performance.  Although the parties dispute whether Delaware or Maryland law applies to whether such equitable relief is available, their dispute is largely academic since the standards are essentially the same. *Compare Minn. Invco of RSA No. 7, Inc. v. Midwest Wireless Holdings LLC*, 903 A.2d 786, 794 (Del. Ch. 2006) (noting that ordering specific performance rests in the discretion of the court and is only available when there is no adequate remedy at law) (citations omitted), *with Cattail Associates, Inc. v. Sass*, 907 A.2d 828, 844 (Md. Ct. Spec. App. 2006) (reasoning that specific performance is an "extraordinary equitable remedy which may be granted, in the discretion of the chancellor, where more traditional remedies, such as damages, are either unavailable or inadequate") (quotation and citation omitted).

Specific performance may be granted when an agreement is clear and definite and a court does not need to supply essential contract terms.  *Ramone v. Lang*, 2006 WL 905347, at *10 (Del. Ch. Apr. 3, 2006).   "A party seeking specific performance must show by clear and convincing evidence that (1) a valid contract exists; (2) the party is ready, willing, and able to perform; and (3) the balance of the equities tips in favor of the party seeking performance." *Corkscrew Min. Ventures Ltd. v. Preferred Real Estate Invs., Inc.*, 2011 WL 704470, at *6 (citing *Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010)).  Those factors militate in favor of granting specific performance here.

First, the jury concluded that the parties had a valid contract with clear and definite terms. WTC agreed to lend funds at a minimum sufficient for the purpose of acquiring and maintaining the Bresler Trust Policies through the lives of Charlie and Fleur Bresler or, alternatively, WTC agreed to lend $5.5 million annually to cover both the annual premiums and overfunding. In exchange for this, WTC received $3.7 million in bonds as collateral for so long as Charlie was

alive, while at all times the death benefits ultimately payable under the policies stood (and continue to stand) as additional collateral.  Second, the Breslers—as the parties seeking specific performance by WTC—have already performed their part of the contract.  Charlie pledged $3.7 million in bonds as collateral during his lifetime and placed WTC first in line upon Fleur Bresler's death to have its loans repaid with interest from the Bresler Trust Policies.  Third, the balance of equities tips in favor of the Breslers.  WTC is not prejudiced by specific performance, inasmuch as—at least under protest—it has been in fact lending the minimum amounts to cover the premiums on the policies since the litigation began and will, to a certainty, get paid back upon Fleur's death.  Conversely, not ordering specific performance would deprive the Breslers of the bargain the jury concluded they struck with WTC.  The Breslers did not elect money damages in lieu of specific performance.  The damages they sought and obtained rested on the assumption that WTC would continue performing as it was obligated to under the premium financing plan, at least insofar as paying the minimum amounts due to keep the policies in force.

WTC's suggestion that the Breslers have received an adequate remedy at law is simply incorrect.  The damages they were awarded were meant to account for the shortfall in the Bresler Trust Policies caused by WTC's refusal to lend either amounts necessary to cover either the minimum due for the annual premiums or the $5.5 million annually to pay for and overfund the policies above the $50 million death benefit.  But the absolute floor of that agreement remains the $50 million death benefit.  To decline to order specific performance in favor of the Breslers would clearly contradict the jury's conclusions regarding WTC's obligations.  Finally, despite WTC's posturing on this point, the Court is hard pressed to believe that WTC really wants to have the option to ceasing to make loans and earning interest on the loans, given that it stands to recover, sooner rather than later, the entire amount of its loans and interest.  What better security

for repayment than the policies themselves—but only, of course, so long as they remain in effect hereafter?

What amounts, then, should WTC be ordered to lend—the minimum amounts to keep the policies in effect or the amounts that would cover the minimum premiums plus any amount above that, up to $5.5 million annually, to be applied to overfunding?  The Court notes that even the Breslers now take the position that they would be satisfied with the lower amount, which is to say, loans to cover the minimum payments that would keep the policies in effect through the life of Fleur.  Since the Court has discretion in the matter, it chooses to order that WTC make the minimum payments necessary to keep the Bresler Trust Policies in effect until Fleur's death.  Accordingly, an order of specific performance to this effect will accompany an order entering judgment on the jury's verdict of damages in the total amount of $23,361,692 (*i.e.*, $3.9 million for the replacement term life policies purchased on Fleur's life; $10,668,687, representing the shortfall value of the policies to the date of trial; and $8,793,005, representing the future shortfall value of the policies).  *See* Special Verdict Question 11.

## V.

For the foregoing reasons, WTC's Motion for Judgment as a Matter of Law or Alternatively to Amend the Verdict, Set a New Trial and/or Require Remittitur is **DENIED**. WTC's Motion for Other Relief is **DENIED**.  The Breslers' request for specific performance is **GRANTED**.

A separate order will issue.


                                        _____/s/_____
                                        **PETER J. MESSITTE**
                                        **UNITED STATES DISTRICT JUDGE**


March 25, 2015